**FILED IN CHAMBERS**
U.S.D.C. - Atlanta

APR 1 2 2013

James N. Hatten, Clerk
By: /s/ FM Cauu
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WALBRIDGE ALDINGER COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>D&N ELECTRIC COMPANY, DNS CONSOLIDATED, INC., and MATTHEW ARMSTRONG, *individually*,<br><br>    Defendants;<br><br>UNITED STATES OF AMERICA for the use and benefit of D&N ELECTRIC COMPANY,<br><br>    Consolidated Plaintiff,<br><br>v.<br><br>TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, WALBRIDGE ALDINGER COMPANY,<br><br>    Consolidated Defendants;<br><br>DNS CONSOLIDATED, INC.,<br><br>    Counter Plaintiff,<br><br>v.<br><br>WALBRIDGE ALDINGER COMPANY,<br><br>    Counter Defendant;<br><br>D&N ELECTRIC COMPANY,<br><br>    Counter Plaintiff,<br><br>v.<br><br>WALBRIDGE ALDINGER COMPANY,<br><br>    Counter Defendant; | CIVIL ACTION NO.<br>1:11-CV-4602-ODE |


```
MATTHEW ARMSTRONG,
individually,
          Counter Plaintiff,
v.
WALBRIDGE ALDINGER COMPANY,
          Counter Defendant.
```

ORDER

This diversity case is currently before the Court on Defendants D&N Electric Company ("D&N") and Matthew Armstrong's ("Armstrong") Motion for Partial Summary Judgment [Doc. 59]. For the reasons set forth below, D&N and Armstrong's Motion for Partial Summary Judgment [Doc. 59] is GRANTED. Specifically, Plaintiff Walbridge Aldinger Company's ("Walbridge") claim for tortious interference with contractual relations against D&N and Armstrong is dismissed. However, this claim remains pending against DNS Consolidated, Inc. ("DNS"). Further, Walbridge's other claims against D&N and Armstrong remain pending.

I.  Background

Unless otherwise indicated, the following facts are undisputed.

Walbridge, a general contractor, entered into prime contracts with the Army Corp of Engineers ("Corp") to construct two projects: the "Reserve Center Project" at Ft. Benning, Georgia; and the "IBCT Project" at Ft. Stewart, Georgia [Doc. 63-1 ¶¶ 1-3].

In October 2009, Walbridge and D&N entered into a subcontract, with D&N "provid[ing] certain labor, material and services for the electrical portion of the work on the IBCT

2

Project" [Doc. 59-2 ¶ 4; see also Doc. 59-4].  In June 2010, Walbridge entered into a subcontract with DNS, by which DNS would "provide certain labor, material and services for the electrical portion of the work on the Reserve Center Project" [Doc. 59-2 ¶ 5; see also Doc. 59-5].  DNS further subcontracted with D&N, for assistance on the Reserve Center Project [Doc. 63-1 ¶ 5].

At all times relevant to this action, Armstrong: was the President of D&N; held an ownership interest in D&N; had a personal financial interest in D&N; and "was ultimately responsible for the subcontract th[at] Walbridge and D&N entered into regarding the ICBT [sic] Project and was ultimately responsible for the labor that DNS subcontracted to D&N with respect to the Reserve Center project" [Doc. 59-2 ¶¶ 6-9; see also Doc. 63-1 ¶¶ 6-9].

At some point, a dispute arose between D&N and Walbridge. According to D&N and Armstrong, Armstrong subsequently "traveled to Ft. Benning to discuss the Reserve Center Project with Walbridge's project manager, John Walker" [Doc. 59-2 ¶ 11]. Walbridge on the other hand, contends that "Armstrong traveled to Ft. Benning for the express purpose of intimidating Walker because Walker had accused D&N of certain contract breaches and had denied D&N's claims for additional compensation" [Doc. 63-1 ¶ 11; see also Doc. 63 at 4 ("On December 5, 2011, D&N decided to apply additional pressure to Walbridge by sending Armstrong to Ft. Benning along with two other men to intimidate and coerce Walker.")]. While the parties dispute what exactly was said or happened, it appears they at least agree that Armstrong and Walker

3

were involved in some sort of physical altercation [<u>compare</u> Doc. 59-2 ¶¶ 15-19, <u>with</u> Doc. 63-1 ¶¶ 15-19].

On December 30, 2011, Walbridge filed a Complaint in this Court against DNS, D&N, and Armstrong, alleging: (1) breach of the Reserve Center Project subcontract; (2) breach of the IBCT Project subcontract; (3) tortious interference with contractual relations; and (4) attorneys' fees pursuant to O.C.G.A. § 13-6-11 [Doc. 1].

On February 26, 2013, D&N and Armstrong filed a Motion for Partial Summary Judgment on Plaintiff's claim for tortious interference with contractual relations [Doc. 59]. Plaintiff has filed a response [Doc. 63], to which D&N and Armstrong have replied [Doc. 67].

II. <u>Legal Standard</u>

The Court will grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

To be material, a fact must be identified by the controlling substantive law as an essential element of the non-moving party's case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For

factual issues to be considered genuine, they must have a real basis in the record." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (internal quotation marks and citations omitted). For instance, "[m]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." Ellis v. England, 432 F.3d 1321, 1325-26 (11th Cir. 2005) (citations omitted). The moving party's burden may be discharged by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

In reviewing the record, the district court must construe the acts and make all reasonable inferences in favor of the non-moving party. Anderson, 477 U.S. at 255; Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

III. Discussion

In its response, Walbridge clarifies that it is claiming that D&N and Armstrong interfered with three contracts: "(1) the Prime Contract between Walbridge and the Corps on the IBCT [P]roject; (2) the Prime Contract between Walbridge and the Corps on the Reserve Center Project; and (3) the subcontract between Walbridge and DNS on the Reserve Center Project" [Doc. 63 at 10]. Plaintiff alleges that these contracts were interfered with via the altercation between Armstrong and Walker. Specifically, in its response, Plaintiff states:

> Armstrong's assault on Walker caused severe damage to Walker that not only required several hospital visits, but that also impaired Walker in performing his role as project manager for an extended period of time. As Walker was Walbridge's project manager for both the

> IBCT Project and the Reserve Center Project, Walbridge management for the projects was made more difficult and required additional time and effort from other Walbridge personnel. As a direct result of the assault, Walbridge's contracts with the Corps and with Walbridge's subcontractors, on both the IBCT Project and the Reserve Center Project, suffered. In addition, Walbridge paid for Walker's medical attention, including hospital and doctor visits and paid certain unplanned travel expenses for Walker associated with the attack. These were costs and expenses that the IBCT and Army Reserve Center projects absorbed.

[Id. at 5-6 (citations omitted)].[1]

Under Georgia law,

> [t]he elements of tortious interference with contractual relations, business relations, or potential business relations are: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

J. Kinson Cook of Ga., Inc. v. Heery/Mitchell, 284 Ga. App. 552, 556-57 (Ga. Ct. App. 2007) (citations omitted) [hereinafter "Kinson"]. To act as a "defendant without privilege," "the defendant must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract; thus, all parties to an interwoven contractual arrangement cannot be liable for tortious interference with any of the contracts or business relationships that underlie such contractual arrangement." Dalton Diversified, Inc. v. AmSouth Bank, 270 Ga. App. 203, 209 (Ga. Ct. App. 2004). Also,

---

[1] The Court provides this statement only as a means of providing context for Plaintiff's claim.

6

> "[o]ne is not a stranger to the contract just because one is not a party to the contract." Those who have a direct economic interest in or would benefit from a contract with which they are alleged to have interfered (even though not intended third-party beneficiaries of the contract) are not strangers to the contract and cannot have tortiously interfered.

Mabra v. SF, Inc., 316 Ga. App. 62, 65 (Ga. Ct. App. 2012) (internal alterations and citations omitted). "As this precedent suggests, the group of persons subject to suit for tortious interference as 'strangers' is very limited." Hernandez Auto Painting & Body Works, Inc. v. State Farm Mut. Auto. Ins. Co., No. CV408-256, 2009 WL 2952066, at *2 (S.D. Ga. Sept. 14, 2009).

D&N and Armstrong argue that they are not strangers to the contracts, and thus Plaintiff's claim fails as a matter of law.[2] Specifically, D&N and Armstrong contend that they are not strangers to the contracts because: (1) the contracts are interwoven; and (2) Armstrong had a financial interest in D&N, a party to the contracts [Doc. 59-1]. Plaintiff, in its response, however, contends that D&N and Armstrong are strangers to the contracts because: (1) the contracts are not interwoven; (2) Armstrong acted outside his scope of employment, and D&N acted outside the scope of its subcontract on the IBCT project; and (3) Armstrong's actions are imputed to D&N and were ratified by D&N [Doc. 63].

The Court agrees with D&N and Armstrong that the contracts at issue in this case are interwoven, and thus D&N cannot be held liable. The parties do not dispute that Walbridge and the Corp

---

[2]In fact, at this time, Armstrong and D&N are only contesting Plaintiff's ability to show the first element of this claim [Doc. 59-1 at 7; see also Doc. 67 at 8].

7

entered into prime contracts for the Reserve Center Project and the IBCT Project (contracts Plaintiff now claims Armstrong and D&N interfered with). The parties also do not dispute that Walbridge and D&N entered into a subcontract on the IBCT project, and that Walbridge and DNS entered into a subcontract on the Reserve Center Project (the third contract at the center of Plaintiff's claim). Lastly, the parties agree that DNS further subcontracted with D&N, for D&N to perform work on the Reserve Center Project. These facts alone hint at the interwoven nature of these contracts.

D&N and Armstrong rely on <u>Kinson</u>, 284 Ga. App. 552, to support their position. In <u>Kinson</u>, Kinson was hired by the Dekalb County School District to build a new high school. <u>Id.</u> at 554. The School District also contracted with Heery "to provide professional construction program management services for the project." <u>Id.</u> When Heery felt that the project was not going to be completed on time, it hired additional construction crews and dealt directly with the subcontractors. <u>Id.</u> at 555. Kinson claimed, in part, that "Heery tortiously interfered with its relationships with its subcontractors by bypassing it and giving directions directly to subcontractors during the project." <u>Id.</u> at 556. The Georgia Court of Appeals affirmed the granting of summary judgment in Heery's favor on this claim, finding Heery was not a stranger to the contract. <u>Id.</u> at 557. The Georgia Court of Appeals reasoned that: "the record reflect[ed] that the entire project encompassed 'a comprehensive interwoven set of contracts' providing for the construction of the [high school]"; and "Heery's alleged acts were undertaken in its capacity as the construction

project manager and the school district's agent to ensure the proper and timely completion of the project." Id.

The Court finds that Kinson supports a finding that D&N is not a stranger to the contracts. Just as the contracts in Kinson were interwoven, so are the contracts in this case. Because D&N is a subcontractor (or sub-subcontractor), there is a link between the contract D&N is a party to and the contracts allegedly interfered with. Walbridge tries to distinguish this case on the basis that Kinson "involv[ed] a construction manager's (Heery's) contractual right to interfere with the contractor's claim" and "Heery's construction management contract expressly granted Heery the qualified privilege to manage all construction" [Doc. 63 at 12]. While Heery may have had this "privilege," the Court does not believe that the absence of such a "privilege" means the contracts are not interwoven. As a practical matter, it is clear that the prime contracts and subcontracts are related, as there would be no subcontracts without the prime contracts, and the subcontracts were brought about for the purpose of completing part of the prime contracts.

Walbridge also argues that because D&N was only performing a small portion of the work required by the prime contracts, D&N is a stranger to the prime contracts and subcontract between DNS and Walbridge. The Court finds this argument utterly without merit, as it is still clear that the contracts are interwoven.

In fact, the text of the subcontract between Walbridge and D&N states, in part:

> ARTICLE 1 - WORK TO BE PERFORMED: Except as otherwise provided herein, Subcontractor shall furnish all labor, materials, tools, equipment, supervision and services

9

> necessary to properly prosecute and complete the work identified and described in Exhibit D attached herein (the "Work") being a portion of the work required of Contractor under the Agreement Between Owner and Contractor. . . .
> . . . .
> Subcontractor shall be bound by the terms of the Agreement Between Owner and Contractor and all documents incorporated therein . . . .

[Doc. 59-4 at 2]. The original subcontract between Walbridge and DNS contains this same language [Doc. 59-5 at 8], which is reinforced in a rider to the subcontract [Doc. 59-5 at 1 ("Subcontractor shall be bound by the terms of the Agreement Between Owner and Contractor and all documents incorporated therein . . . .")]. Such language clearly supports a finding that the prime contracts and subcontracts are interwoven, as the subcontracts even refer to the prime contracts. Accordingly, because D&N is not a stranger to the contracts, D&N cannot be liable for tortious interference with contractual relations.

D&N and Armstrong further contend that because Armstrong had a financial interest in these contracts it cannot be held liable for tortious interference with contractual relations. Again, the Court must agree with D&N and Armstrong. As the parties admit, Armstrong, President of D&N, was responsible for D&N's work under the subcontracts, and he also had an ownership interest in D&N. Thus, it is clear that Armstrong benefitted from the interwoven contracts.

As noted above, Walbridge contends that there is a genuine dispute that Armstrong was acting outside the scope of his employment, and thus he is a stranger to the contracts. The Court finds Walbridge's argument perplexing. While the parties dispute what happened on December 5, 2011, Plaintiff's own allegations

undermine its claim. Specifically, Plaintiff claims that "[o]n December 5, 2011, D&N decided to apply additional pressure to Walbridge by sending Armstrong to Ft. Benning along with two other men to intimidate and coerce Walker" [Doc. 63 at 4]. Because Plaintiff is contending that D&N sent Armstrong to Ft. Benning to carry out the acts Plaintiff complains of, Armstrong could not have been acting outside the scope of his employment. Accordingly, while the parties dispute what happened on the day in question, because, even when accepting Walbridge's allegations as true, it is clear that Armstrong is not a stranger to the contracts. He cannot be held liable for tortious interference with contractual relations.[3]

IV. Conclusion

For the foregoing reasons, D&N and Armstrong's Motion for Partial Summary Judgment [Doc. 59] is GRANTED. Walbridge's claim for tortious interference with contractual relations against D&N and Armstrong is dismissed. However, this claim remains pending against DNS. Walbridge's other claims against D&N and Armstrong also remain pending.

SO ORDERED, this __12__ day of April, 2013.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE

---

[3]D&N and Armstrong also argue that the "outside the scope of employment" exception does not even apply, because Armstrong, the President and partial owner of D&N, and D&N are not Walbridge's employees [Doc. 67 at 4]. Because the Court has already found that Armstrong and D&N are not strangers to the contracts, the Court need not address this argument.

11