IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WALBRIDGE ALDINGER COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil Action |
| v. | ) No. 1:11-CV-04602-ODE |
| | ) |
| D & N ELECTRIC COMPANY, | ) |
| DNS CONSOLIDATED, INC., and | ) |
| MATTHEW ARMSTRONG, | ) |
| Individually, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**WALBRIDGE ALDINGER COMPANY'S
RESPONSE AND MEMORANDUM IN OPPOSITION
TO DEFENDANT DNS CONSODLIDATED, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

DNS Consolidated, Inc.'s Motion for Partial Summary Judgment concerning Walbridge's claim for Tortious Interference with Contractual Relations should be denied because, contrary to DNS's only argument, DNS was a stranger to Walbridge's contracts with the U.S. Army Corps of Engineers and with D&N Electric Company concerning the IBCT Project at Ft. Stewart. This case involves two federal government construction projects on which Walbridge was the general contractor: the Reserve Center Project at Ft. Benning and the IBCT Project at Ft. Stewart. DNS was the electrical subcontractor on the Reserve Center Project at Ft.

Benning. D&N Electric Company was the electrical subcontractor on the IBCT Project at Ft. Stewart.

DNS contends—without any evidentiary support[1]—that it is not a stranger to the contracts between Walbridge and the U.S. Army Corps of Engineers concerning the two Projects. But DNS has no relationship to the IBCT Project. DNS was not a party to any interwoven contract on the IBCT Project, and DNS had no financial interest in the IBCT Project. DNS's argument fails because DNS was a stranger to the IBCT Project.

**I.    FACTS**

Walbridge, as the general contractor, entered into two contracts with the United States Army Corps of Engineers for work on the Ft. Benning Reserve Center Project ("Reserve Center Project") and the Ft. Stewart Infantry Brigade Team Complex Project ("IBCT Project"). (John Walker Affidavit – Ex. "A" hereto, ¶ 3). Walbridge subcontracted out certain portions of the labor, materials, and services for the electrical portion of the IBCT Project to D&N. (Walker Affidavit – Ex. "A" hereto, ¶ 5). Walbridge subcontracted with DNS Consolidated Inc. ("DNS") for electrical labor, services, and materials for the Reserve Center Project. (Walker Affidavit – Ex. "A" hereto, ¶ 6). It is Walbridge's understanding

---

[1] DNS has not filed an affidavit or declaration or cited any evidence in support of its Motion for Partial Summary Judgment.

that DNS subcontracted a portion of the Reserve Center Project labor to D&N. (Walker Affidavit – Ex. "A" hereto, ¶ 7).

During the course of the projects, Walker, as Walbridge's project manager for both the IBCT and Reserve Center Projects notified D&N and DNS that they had breached their subcontracts for several reasons. (Walker Affidavit – Ex. "A" hereto, ¶¶ 9-11). Moreover, both D&N and DNS submitted additional payment claims to Walbridge in excess of $14 million, which Walker denied. (Walker Affidavit – Ex. "A" hereto, ¶ 11). Walker determined that the claims were meritless or in contradiction to the subcontract terms and conditions. (Walker Affidavit – Ex. "A" hereto, ¶ 11).

In apparent retribution for its claims being denied and Walbridge's claims of breach of contract, DNS began withholding payment to DNS's subcontractors on the Reserve Center Project in order to pressure Walbridge into paying D&N and DNS's claims. (Walker Affidavit – Ex. "A" hereto, ¶ 12). DNS's actions, including its failure to pay subcontractors and suppliers, affected Walbridge's contracts on both the IBCT Project and the Reserve Center Project. (Walker Affidavit – Ex. "A" hereto, ¶ 12).

On December 5, 2011, D&N decided to apply additional pressure to Walbridge by sending Armstrong to Ft. Benning along with two other men to intimidate and coerce Walker. (Walker Affidavit – Ex. "A" hereto, ¶ 13). Walker

was not in his office when Armstrong and the other two men arrived. (Walker Affidavit – Ex. "A" hereto, ¶ 14). Armstrong and the two men chose to wait for Walker, ultimately catching Walker as he left the restroom in Walbridge's project office trailer. (Walker Affidavit – Ex. "A" hereto, ¶ 15). Armstrong and the two other men followed Walker into his office, uninvited. (Walker Affidavit – Ex. "A" hereto, ¶¶ 15-16). Armstrong proceeded to walk around Walker's desk, ultimately standing over the seated Walker, with their knees touching, and began swearing at Walker. (Walker Affidavit – Ex. "A" hereto, ¶ 17).

Feeling threatened, and having Armstrong standing directly over him, Walker stood up from his desk, placed his hands in his pockets, and told Armstrong to leave. (Walker Affidavit – Ex. "A" hereto, ¶ 18). Armstrong refused, and then physically attacked Walker, repeatedly hitting Walker in the head, body, neck, and arms. (Walker Affidavit – Ex. "A" hereto, ¶ 19). Despite Armstrong's accomplices' attempts to block the exit, Walker managed to escape from the office and stumble into the office common room. (Walker Affidavit – Ex. "A" hereto, ¶ 20). The assault stopped once Walker entered the common room, only because another Walbridge employee heard the commotion, came out of his office, and saw Armstrong standing over Walker. (Walker Affidavit – Ex. "A" hereto, ¶ 21). After having severely beat Walker, Armstrong and the other two men left Ft. Benning. (Walker Affidavit – Ex. "A" hereto, ¶ 22). At no point

during the assault did Walker strike, hit, push, or otherwise assault Armstrong. (Walker Affidavit – Ex. "A" hereto, ¶ 23).

Armstrong's assault on Walker caused severe damage to Walker that not only required several hospital visits, but that also impaired Walker in performing his role as project manager for an extended period of time. (Walker Affidavit – Ex. "A" hereto, ¶ 24; Gary Webb Affidavit – Ex. "B" hereto, ¶¶ 9-10). As Walker was Walbridge's project manager for both the IBCT Project and the Reserve Center Project, Walbridge management for the projects was made more difficult and required additional time and effort from other Walbridge personnel. (Webb Affidavit – Ex. "B" hereto, ¶ 10). As a direct result of the assault, Walbridge's contracts with the Corps and with Walbridge's subcontractors, on both the IBCT Project and the Reserve Center Project, suffered. (Webb Affidavit – Ex. "B" hereto, ¶¶ 9-10). In addition, Walbridge paid for Walker's medical attention, including hospital and doctor visits and paid certain unplanned travel expenses for Walker associated with the attack. (Webb Affidavit – Ex. "B" hereto, ¶ 9). These were costs and expenses that the IBCT and Army Reserve Center projects absorbed. (Webb Affidavit – Ex. "B" hereto, ¶ 9).

\
\
\

## II.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Summary Judgment Standard

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a); *see also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970) (the party moving for summary judgment has the burden to show the absence of a genuine issue of material facts).

When determining whether the moving party has met its burden, the court must view the evidence and factual inferences in the light most favorable to the nonmoving party. *Id.* Consequently, "if reasonable minds could differ on the inferences arising from disputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). Put differently, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933-34 (11th Cir. 1989). The primary issue before the Court is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct.

2505 (1986).   The court must not weigh conflicting evidence when faced with summary judgment.  *Id.* at 255.

### B.   Elements of Tortious Interference with Contractual Relations

Tortious interference with contract or business relations requires a plaintiff to prove an intentional and non-privileged interference by a third party with existing contract rights and relations.  *Phillips v. MacDougald*, 219 Ga. App. 152, 153 (1995), *see also Weigland v. City of Perry*, No. 5:05-cv-392, 2008 WL 350975 (M.D. Ga. Feb. 7, 2008).

In order to show interference, the plaintiff does not have to show that the conducted resulted in an actual breach of contract in order to be actionable. *See Phillips*, 219 Ga. App. at 153-54.  Rather, it is sufficient that the interference "retards the performance of the duties under the contract or makes the performance more difficult or expensive." *Id.* at 154.  It is generally a question of fact, and therefore for the jury, whether a defendant played a part in causing a plaintiff's loss of any benefits under the contract.  *Id.*

The "privilege" element requires the plaintiff to show that the defendant was an intermeddler or stranger to the relationship at issue. *Mabra v. SF, Inc.*, 316 Ga. App. 62, 64 (2012).  A person is generally not a stranger to the contract if the person would benefit economically from the relations at issue. *See Britt/Paulk Ins. Agency v. Vandroff Ins. Agency*, 952 F. Supp. 1575, 1584 (N.D. Ga. 1996).  And,

where a defendant is not a stranger to the contract, a claim for tortious interference cannot survive. *See Johnson v. Rogers*, 214 Ga. App. 557, 559 (1994).

There are exceptions to the economic-benefit and stranger requirements. For example, the economic benefit and stranger requirements only apply to parties acting within the scope of their employment or contract. *See AmeriGas Propane, L.P. v. T-Bo Propane, Inc.*, 972 F. Supp. 685, 695 (S.D. Ga. 1997), *B&F Sys., Inc. v. LeBlanc*, 7:07-cv-192, 2011 WL 4103576 (M.D. Ga. Sept. 14, 2011), *Atlanta Market Center Management, Co. v. McLane*, 269 Ga. 604, 608-09 (1998), *Georgia Kraft Co., Woodkraft Division v. Laborers' International Union of North Alabama, Local Union 246*, 170 Ga. App. 581 (1984). In other words, the stranger requirement is limited to those circumstances where the tortious interference claim is based on acts resulting from the party's official duties, but does not apply for actions executed outside the party's official duties. *AmeriGas Propane*, 972 F. Supp. at 695. Thus, a party acting outside the scope of its employment or contract can be liable for tortious interference with contract even when the party is not a stranger to the contract or receives economic benefit from the project.

\

\

\

### C.  DNS's Actions Interfered with Walbridge's Performance of the IBCT and Reserve Center Projects, Causing them to be More Time Consuming, Expensive, and Difficult.

DNS interfered with Walbridge's IBCT and Reserve Center Projects with the Corps. DNS withheld payment to DNS's subcontractors on the Reserve Center Project in order to pressure Walbridge into paying D&N's disputed claims on the IBCT Project and DNS's disputed claims on the Reserve Center Project. By withholding payment from its subcontractors, DNS added difficulty and expense to Walbridge's performance on both the IBCT Project and the Reserve Center Project by forcing Walbridge to use additional time, personnel, and monetary resources on both the IBCT Project and the Reserve Center Project.

### D.  DNS is a Stranger to the IBCT Project.

DNS was not a subcontractor on the IBCT Project. DNS had no contractual relationship to the IBCT Project. A party is part of an interwoven contract only when it has a direct economic interest in the contract. *See LaSonde v. Chase Mortg. Co.*, 259 Ga. App. 772, 773-74 (2003). DNS had no economic interest in the IBCT Project or any contract on the IBCT Project. Therefore, DNS is a stranger to the IBCT Project and the IBCT contracts.

### E.  DNS is a Stranger to Walbridge's Contract with the Corps on the Reserve Center Project.

DNS was a subcontractor to Walbridge on the Reserve Center Project. This subcontract was separate and apart from the contract Walbridge had with the

Corps.  DNS's duties, rights, and responsibilities were fully laid out in its subcontract.  This subcontract constituted a relatively small portion of the overall work Walbridge was obligated to perform pursuant to Walbridge's contract with the Corps.

The contractual relationship between the Corps, Walbridge, and DNS does not meet the requirements for an interwoven contract.  Instead, Walbridge's contracts with DNS created a direct or linear relationship, with each contract addressing defined requirements.  DNS had no interest in Walbridge's contracts with the Corps, except as to DNS's limited scope of work.  Therefore, instead of being an interwoven set of contracts in which all parties share interests in each contract, in this situation a downstream subcontractor (DNS) interfered with upstream contracts.  This situation differs markedly from the cases cited by DNS.

DNS cites *J. Kinson Cook of Georgia, Inc. v. Heery/Mitchell*, 284 Ga. App. 552 (2007), for the proposition that any parties with related contracts are protected from tortious interference claims.  But *J. Kinson Cook* was based on a different situation involving a construction manager's contractual right to interfere with the contractor's claim.  *J. Kinson Cook*, 284 Ga. App. at 554-58.  Unlike the current situation, the parties in *J. Kinson Cook* lacked any clearly defined lines of privity, and Heery's construction management contract expressly granted Heery the qualified privilege to manage all construction.  Put differently, Heery had a

contract with the owner to provide construction management services that included a qualified right to manage other subcontracts, trades, and contractors.  *Id.* at 556.  These management duties included directing subcontractor work and contacting a non-performing trade's surety, which were the exact grounds on which the plaintiff based its tortious interference claim.  *Id.* at 557.  The owner granted Heery the ability to interfere with the other contracts, even though Heery's contract was only with the owner, and not with the general contractor or any subcontractor(s).  *Id*.  Simply put, it was part of Heery's job to interfere.  *Id.*  Thus, because Heery's performance of its contract was interwoven with the requirements of other contracts, the court found that Heery was not a stranger to the contract.  *See id.* at 557-58.

Unlike Heery, DNS lacked any type of qualified right to interfere with Walbridge's contract with the Corps, meaning the contracts were not interwoven.  DNS was a downstream subcontractor whose contract with Walbridge was independent of Walbridge's contract with the Corps on the Reserve Center Project.  In other words, DNS lacked any business relationship with the Corps on the Reserve Center Project.  Rather, DNS only had a relationship with Walbridge.  DNS' argument that a downstream subcontractor performing a limited-scope subcontract should be allowed to interfere with an unrelated and much larger prime contract that DNS is not privy to unduly expands the interwoven contract doctrine.

Therefore, DNS lacks the requisite privilege to interfere with the Reserve Center Project prime contract between Walbridge and the Corps.

### F. DNS Acted Outside the Scope of its Subcontract on the Reserve Center Project

Even assuming that DNS is not a stranger to the contracts, DNS remains liable for tortious interference because of certain exceptions to the stranger and economic-benefit rules. It is well established that a party that acts outside the scope of its employment or agency can be held liable for tortious interference. *See B&F Sys.*, 2011 WL 4103576 at *14, *Brathwaite v. Fulton-DeKalb Hosp. Authority*, 317 Ga. App. 111, 113 (2012) (limiting the stranger exception parties acting in their official capacity), *Medical Center, Inc. v. Humana Military Healthcare Services, Inc.*, No. 4:10-cv-124, 2012 WL 3295640 (M.D. Ga. Aug. 10, 2012) (limiting stranger exception to corporation that was acting within the scope of its subcontract), *Life Alarm Sys, Inc. v. Valued Relationships, Inc.*, CV 109-117, 2011 WL 1167174 (S.D. Ga. Mar. 28, 2011) (finding circumstances exist where a party may be liable for tortious interference if acting outside its scope).

In this instance DNS is liable for tortious interference, regardless of whether it is a stranger, because it was acting outside the scope its subcontract when it withheld payment from its subcontractors. DNS's choice to withhold payment falls outside its subcontract with Walbridge on the Reserve Center Project. Accordingly,

DNS is not entitled to protection as a stranger or to the economic-benefit rule, and DNS may be held liable for tortious interference.

### III. CONCLUSION

For the foregoing reasons, Walbridge asks the Court to deny DNS's motion for partial summary judgment.

Submitted this 26th day of August, 2013.

SMITH, CURRIE & HANCOCK LLP

*/s/ Douglas L. Tabeling*
Eric L. Nelson
Georgia Bar Number 537850
elnelson@smithcurrie.com
Douglas L. Tabeling
Georgia Bar Number 123671
dltabeling@smithcurrie.com
Lochlin B. Samples
Georgia Bar Number 303893
lbsamples@smithcurrie.com

245 Peachtree Center Avenue, N.E.
Suite 2700 Marquis One Tower
Atlanta, Georgia   30303-1227
Telephone:  (404) 521-3800
Facsimile:   (404) 688-0671

*Attorneys for Plaintiff*
*Walbridge Aldinger Company*

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2013, I served a true and correct copy of **PLAINTIFF WALBRIDGE ALDINGER COMPANY'S RESPONSE TO DEFENDANT DNS CONSOLIDATED, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT** on counsel of record for all parties via U.S. Mail, first-class postage prepaid and addressed as follows:

| | |
|---|---|
| Ronald J. Garber, Esq.<br>Weissman Zucker Euster Morochnik, P.C.<br>3490 Piedmont Road<br>Suite 650, One Securities Centre<br>Atlanta, Georgia   30305 | Patrick J. O'Connor, Esq.<br>Kenneth A. Shapiro, Esq.<br>Mitchell & Shapiro, LLP<br>3490 Piedmont Road, N.E.<br>Suite 650, One Securities Centre<br>Atlanta, Georgia   30305 |
| Brian J. Duva, Esq.<br>Richard S. Bruno, Esq.<br>Mozley, Finlayson & Loggins, LLP<br>5605 Glenridge Drive<br>One Premier Plaza, Suite 900<br>Atlanta, Georgia   30342-1386 | Stephen M. Schatz, Esq.<br>Mike O. Crawford, Esq.<br>Swift, Currie, McGhee & Hiers, LLP<br>1355 Peachtree Street, N.E.<br>The Peachtree, Suite 300<br>Atlanta, Georgia   30309-3238 |

This 26th day of August, 2013.

> */s/ Douglas L. Tabeling*
> Douglas L. Tabeling
> Georgia Bar Number 123671
> dltabeling@smithcurrie.com
> SMITH, CURRIE & HANCOCK LLP
> 245 Peachtree Center Avenue, N.E.
> Suite 2700 Marquis One Tower
> Atlanta, Georgia   30303-1227
> Telephone:  (404) 521-3800
> Facsimile:   (404) 688-0671
> *Attorneys for Plaintiff*
> *Walbridge Aldinger Company*